UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| HENRIETTA SMITH as next friend of | ) |
| H.K. and N.S, and | ) |
| NICKEIL BETHEA-SMITH, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| STACEY BAINS, | ) |
| KARA PADGETT, | ) |
| AMANDA BROWN, | ) |
| STACEY KELLY, | ) |
| OCTAVIA KEITT, | ) |
| DANIELE CATHEY, | ) |
| JERONIA BOWDEN, | ) |
| TIARRA CARTER, | ) |
| CARYN FORBES, and | ) |
| WELLPATH, LLC | ) |
| | ) |
| Defendants. | ) |

## **COMPLAINT**

This case is brought by Plaintiffs Nickeil Bethea-Smith, H.K., and N.S. the three surviving children of Nicole Smith, against six deputies of the Cobb County Sheriff, the medical provider at the Cobb County jail, Wellpath, LLC, and three Wellpath employees. This case arises from Nicole Smith's tragic suicide while incarcerated in the Cobb County detention center. This case demonstrates systemic and callous indifference by each Defendant to the known risk of self-harm by Ms. Smith.

1

<u>Allegations common to all counts</u>

1.  Plaintiff Nickeil Bethea-Smith is the adult surviving child of Nicole
    Smith.

2.  Plaintiffs H.K. and N.S. are the two surviving minor children of Nicole
    Smith. This case is brought on their behalf by their grandmother, Plaintiff
    Henrietta Smith as next friend.

3.  Nicole Smith was a pretrial detainee and was incarcerated as a result of
    her arrest and pending criminal charges.

4.  At the time Ms. Smith committed suicide, she had been incarcerated at
    the detention center for almost eight months.

5.  On April 5, 2022, Ms. Smith attempted to commit suicide by tying a
    sheet around her neck.

6.  After that suicide attempt, jail staff placed Ms. Smith on a form of suicide
    watch called "close observation."

7.  Although Ms. Smith's incarceration was called "close observation," the
    interior of Ms. Smith's cell could only be viewed through a small
    window in the door.

8.  On April 9, 2022, and thereafter, Ms. Smith began refusing her prescribed
    psychiatric medications.

9.     Throughout her entire time in the jail, Ms. Smith routinely refused her medication.

10.    Inmates held in close observation are not allowed access to clothing, linens, personal hygiene products, or any item that could be used to commit suicide.

11.    Inmates on close observation are generally only allowed to possess an anti-suicide safety smock and a mattress.

12.    Nevertheless, jail policy states that inmates on close observation were to be given mesh underwear during their menstrual cycles.

13.    Inmates on suicide watch were not allowed to wear underwear at any other time.

14.    The type of mesh underwear used by the Cobb County Detention Center to be given to inmates on suicide watch during their menstrual cycles is not designed to prevent suicide.

15.    Instead, the detention center dispenses underwear to individuals on suicide watch that is advertised by the manufacturer as "strong enough to withstand 50 institutional washings."

16.    On April 11, 2022, Ms. Smith was able to use the mesh underwear supplied to her to create a ligature tied around her neck.

17.   A jailer discovered that suicide attempt after finding Ms. Smith with the underwear tied around her neck during a routine wellness check.

18.   Ms. Smith's April 11 suicide attempt clearly demonstrated that the mesh underwear supplied to inmates on suicide watch, and to Ms. Smith specifically, was dangerous and gave those inmates a clear means to commit suicide.

19.   Next, on May 13, 2022, Ms. Smith again attempted suicide by tying underwear around her neck.

20.   The underwear used by Ms. Smith was the same type of mesh underwear Ms. Smith used on April 11.

21.   This time, Ms. Smith was discovered when another inmate looked into the window of Ms. Smith's cell door and alerted a guard that Ms. Smith was attempting to commit suicide.

22.   Jail staff found Ms. Smith with mesh underwear used as a ligature around her neck, and the knot was sufficiently tight that Defendant Brown had to cut the underwear off using a pair of scissors she kept on her person.

23.   Ms. Smith's blood oxygen level was low, and her lips and fingers had become discolored.

24.   Ms. Smith appeared to have lost consciousness as a result of the ligature and had a dark mark around her neck where the underwear had been tied.

25.   Jail staff then transported Ms. Smith to the hospital for emergency treatment.

26.   At the hospital, Ms. Smith declined treatment and was discharged the same evening and taken back to the jail.

27.   Ms. Smith committed suicide days later on May 19, 2022, after jail staff gave Ms. Smith another pair of mesh underwear. This gave Ms. Smith the opportunity to, as she had the two times before, use the mesh underwear as a ligature to strangle herself.

28.   All Defendants reside within the Atlanta Division of the Northern District of Georgia.

29.   All actions referenced in this lawsuit occurred within Cobb County, Georgia.

<u>Count I</u>

30.   This count is alleged against Defendants Stacey Kelly and Octavia Keitt and incorporates all previous factual allegations.

31.   At the time of Ms. Smith's death, Defendants Kelly and Keitt were each employed as detention officers by the Cobb County Sheriff's Office.

32.   Defendants Kelly and Keitt previously worked the same unit of the jail in which Ms. Smith was incarcerated.

33.    After Ms. Smith attempted suicide on May 13, 2022, Defendant Kelly worked the following shift in the unit housing Ms. Smith.

34.    After Ms. Smith's May 13 suicide attempt, both Defendants Kelly and Keitt were informed during shift change that Ms. Smith had attempted to commit suicide by using the mesh underwear and that, under no circumstances, should Ms. Smith be allowed to possess mesh underwear.

35.    After that May 13 suicide attempt, the prohibition against giving Ms. Smith mesh underwear was written on a whiteboard in the office of the unit in which Ms. Smith was housed.

36.    That whiteboard was commonly used to provide instructions on inmate care and was one of the means to communicate supervisor directives to jail personnel working the upcoming shifts. Detention officers such as Kelly and Keitt were expected to read the directives posted to the whiteboard.

37.    Defendants Kelly and Keitt also knew that Ms. Smith remained suicidal following her May 13 suicide.

38.    Ms. Smith made statements to Defendants Kelly and Keitt indicating that she was suicidal.

39.    Defendants Kelly and Keitt learned during shift change that Ms. Smith was suicidal.

40. Both Defendants Kelly and Keitt knew that giving Ms. Smith a pair of mesh underwear created a substantial risk that Ms. Smith would use the underwear to kill herself in the same way that she had attempted twice before.

41. Despite this knowledge, on May 19, Defendant Kelly gave Ms. Smith a pair of mesh underwear when Ms. Smith requested it.

42. Defendant Kelly then told Defendant Keitt that Ms. Smith had requested mesh underwear and that Defendant Kelly had given underwear to Ms. Smith.

43. Defendants Kelly and Keitt each knew that Ms. Smith remained suicidal, had attempted to commit suicide twice using mesh underwear, that they received an order that Ms. Smith was not allowed to possess mesh underwear, and that Ms. Smith was alone in her cell with a new pair of mesh underwear.

44. In response, Defendants Kelly and Keitt did nothing to intervene to prevent Ms. Smith's continued access to the mesh underwear.

45. At 6:00 a.m. on May 19, Defendant Keitt found Ms. Smith lying on the floor of her cell with the underwear tied around her neck.

46.     Defendants Kelly and Keitt were deliberately indifferent to a serious risk
        of harm to Ms. Smith in violation of the Fourteenth Amendment of the
        United States Constitution.

<u>Count II</u>

47.     This count is alleged against Defendants Kelly and Keitt and incorporates
        all previous allegations.

48.     The directive not to allow Ms. Smith to possess mesh underwear was
        communicated to Defendants Kelly and Keitt through multiple channels,
        including being written on a whiteboard used to provide instructions to
        detention officers, and being directly communicated to them by
        supervisors.

49.     Defendants Kelly and Keitt had no discretion to deviate from that
        directive.

50.     Defendants Kelly and Keitt's failure to follow these directives constituted
        a negligent breach of the ministerial duty imposed upon them in violation
        of Ga. Const., art. I, § II, ¶ IX (d).

<u>Count III</u>

51.     This count is alleged against Defendant Danielle Cathey and incorporates
        the allegations set forth in ¶¶ 1–29.

52.   Each deputy assigned to Ms. Smith's housing unit was obligated by official policy to perform wellness checks on Ms. Smith in 12-minute intervals.

53.   The Sheriff's policy requires that, when performing a wellness check, a deputy must visually confirm that the inmate is alive, breathing, not attempting any form of self-harm, and not in the midst of a medical emergency.

54.   Deputies have no authority to deviate from the policy requiring routine wellness checks.

55.   After Ms. Smith tied the mesh underwear around her neck on May 19th and laid down in her cell, Defendant Cathey performed a round of wellness checks in the housing unit.

56.   When performing wellness checks, deputies are required to scan a unique code outside of each cell door as a means of verifying that the cell checks were done.

57.   Defendant Cathey then walked the housing unit, scanned the codes outside of each cell door, and scanned the door to Ms. Smith's cell twice.

58.   Defendant Cathey did not actually look into Ms. Smith's cell and could not see Ms. Smith.

59. Had Defendant Cathey looked into Ms. Smith's cell, she would have seen Ms. Smith lying on the floor with underwear wrapped around her neck.

60. Because Defendant Cathey failed to perform the required wellness check, Ms. Smith was not discovered until about 14 minutes later when Defendant Kelly performed a subsequent wellness check and discovered Ms. Smith unresponsive, lying on the floor with underwear wrapped around her neck.

61. If Defendant Cathey had performed a wellness check as required by official policy, she would have seen Ms. Smith with the mesh underwear around her neck in time to save her life.

62. Cathey's actions constituted a negligent breach of her ministerial duty, subjecting her to liability by operation of Art I, Sec. II, Para IX (d).

<u>Count IV</u>

63. This count is alleged against Defendant Amanda Brown and incorporates the allegations set forth in ¶¶ 1–29. This count is pled in the alternative to Counts I and II.

64. Defendant Brown was employed as a sergeant and was a supervisor in the unit housing Ms. Smith.

65. As the supervisor on duty, Defendant Brown oversaw three deputies in that unit.

66.   Sgt. Brown was the supervisor on duty on May 13 when Ms. Smith attempted to commit suicide.

67.   Sgt. Brown was one of the responding officers to Ms. Smith's May 13 suicide attempt and personally witnessed Ms. Smith's loss of consciousness, the blue color of her lips and fingers, and the tightness of the ligature around her neck.

68.   Defendant Brown was the supervisor of the outgoing shift on May 18, 2022, prior to the time Ms. Smith committed suicide.

69.   As supervisor of the outgoing shift, Sgt. Brown was responsible for ensuring that the oncoming shift knew that Ms. Smith was not allowed to possess mesh underwear.

70.   Defendant Brown did not brief the oncoming shift of Defendants Kelly and Keitt or Deputy Cathey that Ms. Smith was not permitted to receive mesh underwear.

71.   Defendant Brown knew that Sgt. Bergman was the supervisor of the oncoming shift on May 18.

72.   Defendant Brown knew that Sgt. Bergman did not work any shift at the jail between May 13 and May 18, and Bergman's first shift after returning from annual leave was May 18.

73. Defendant Brown had a duty to brief Sgt. Bergman on all relevant information concerning the inmates' health and safety during shift change.

74. Defendant Brown knew that no email had been sent to jail staff informing them that Ms. Smith was not allowed to possess mesh underwear and that Sgt. Bergman would not have received any such information in her work email.

75. Defendant Brown knew that there was no written management directive issued concerning Ms. Smith and her prior suicide attempts.

76. Defendant Brown did not brief Sgt. Bergman on any of the events related to Ms. Smith's prior suicide attempts, or the prohibition on Ms. Smith receiving mesh underwear while on suicide watch.

77. Defendant Brown knew that the prohibition on mesh underwear had never been memorialized in the written Pass On Log, which contains information communicated between shifts.

78. Defendant Brown knew that no directive had been issued by Defendant Bains or any other supervisor concerning Ms. Smith's receipt of mesh underwear.

79.   Defendant Brown knew that the whiteboard in the office outside the pod did not specify that Ms. Smith was not permitted to receive mesh underwear.

80.   Defendant Brown knew that the close observation form kept in Ms. Smith's housing unit did not contain a prohibition on Ms. Smith's receipt of mesh underwear.

81.   Defendant Brown's failures to notify the oncoming shifts personnel constituted deliberate indifference under the Fourteenth Amendment because Defendant Brown knew that Ms. Smith previously attempted to commit suicide, that the mesh underwear would be provided to Ms. Smith as a matter of routine practice, and knew that the oncoming shift did not know about the prohibition on providing mesh underwear to Ms. Smith.

Count V

82.   This count is alleged against Defendant Kara Padgett and incorporates the allegations set forth in ¶¶ 1–29. This count is pled in the alternative to Counts I and II.

83.   Defendant Padgett was employed by the Cobb County Sheriff's Office and held the rank of captain.

84.    Defendant Padgett served as the detention center's watch commander on
       May 13, May 14, May 15, and May 18.

85.    As watch commander, Defendant Padgett supervised Defendant Brown,
       Sgt. Bergman, and Defendants Kelly, Keitt, and Cathey.

86.    As part of that responsibility, she and the other watch commanders were
       required to conduct a shift briefing at the beginning of their shift and
       complete the end-of-shift report for the entire jail, called the Supervisor
       Pass On Log.

87.    The Pass On Log documents new and ongoing directives concerning
       inmates, which the oncoming shift commander relays at the shift briefing.

88.    Defendant Padgett had a duty to include important information that
       occurred during her shift and any management directives that staff on
       other shifts would need to know.

89.    Defendant Padgett was the watch commander when Ms. Smith attempted
       suicide on May 13.

90.    Defendant Padgett was responsible for reviewing and reporting the
       incident to the commander and assistant commanders overseeing the jail.

91.    Following the May 13 suicide attempt, Defendant Padgett received a
       copy of the incident report detailing Ms. Smith's use of mesh underwear

and approved the close observation request completed by Defendant Forbes on May 14.

92.    Defendant Padgett knew that, under jail policies, the mesh underwear used by Ms. Smith in her suicide attempt was routinely supplied to women on suicide watch during their menstrual cycles.

93.    Defendant Padgett knew that the close observation form, which would be placed in Ms. Smith's housing unit, did not prohibit her from receiving the underwear while on close observation.

94.    Defendant Padgett knew that no directives concerning Ms. Smith's receipt of underwear while on close observation had been issued in the detention center's computerized "offender management system."

95.    Defendant Padgett knew that no management directives were emailed by Defendant Bains, instructing staff not to give Ms. Smith the mesh underwear while she was on close observation.

96.    Nevertheless, Defendant Padgett did not include a directive prohibiting Ms. Smith from receiving the underwear in the May 13, May 14, May 15, or May 18 Pass On Logs.

97.    As a result, Defendant Kelly and Keitt did not know that they were prohibited from supplying the underwear to Ms. Smith on May 18.

98.   Defendant Padgett's failure to issue and disseminate a management directive violated Ms. Smith's rights under the Fourteenth Amendment because it was deliberately indifferent to the risk that staff would follow jail policy and provide the underwear to Ms. Smith, who would again attempt suicide using the underwear.

Count VI

99.   This count is alleged against Defendant Stacey Bains and incorporates the allegations set forth in ¶¶ 1–29. This count is pled in the alternative to Counts I and II.

100.   Defendant Bains held the rank of major and was assigned to the detention center.

101.   Defendant Bains had supervisory authority over Defendants Kelly, Keitt, and all other detention officers assigned to the unit in which Ms. Smith was incarcerated.

102.   Prior to Ms. Smith's May 13 suicide attempt, Defendant Bains previously issued a directive concerning Ms. Smith's treatment at the jail and disseminated that management directive via email to all jail staff.

103.   Defendant Bains acted as the liaison between the jail's command staff and the jail's medical and mental health providers.

104. After Ms. Smith's May 13 suicide attempt, Defendant Bains entered Ms. Smith's cell and found that Ms. Smith possessed multiple pairs of mesh underwear, in addition to the underwear she used in the suicide attempt.

105. Defendant Bains also knew that Ms. Smith attempted to commit suicide on April 11 by using the mesh underwear.

106. Defendant Bains knew that the mesh underwear was being supplied to women on suicide watch during their menstrual cycles.

107. Defendant Bains knew that no special instructions concerning Ms. Smith's receipt of underwear had been issued in the detention center's computerized "offender management system."

108. Defendant Bains knew the lack of a directive in the offender management system would make communicating a directive difficult and, therefore, it was necessary to promulgate the directive that Ms. Smith not receive mesh underwear through additional means.

109. Defendant Bains knew that the prior management directive she issued for Ms. Smith did not include any prohibition on Ms. Smith's receipt of mesh underwear.

110. Defendant Bains knew that the Pass On Log that memorialized all information communicated between incoming and outgoing shifts at the jail never indicated that Defendant Padgett or other watch commanders

had discussed that Ms. Smith: (a) attempted suicide on May 13; (b) was not allowed to be given mesh underwear; (c) was acutely suicidal; or (d) had been routinely refusing her psychiatric medication.

111.   The whiteboard in the office of Ms. Smith's unit did not indicate any limitation on the items that Ms. Smith was allowed to possess, and instead only indicated that Ms. Smith was on close observation status.

112.   Defendant Bains was responsible for creating inmate management directives and for disseminating those directives to detention officers.

113.   Following Ms. Smith's May 13 suicide attempt, Defendant Bains did not create any management directive informing detention staff that Ms. Smith was not permitted to have mesh underwear.

114.   Defendant Bains knew that jail policy allowed inmates on suicide watch to possess mesh underwear during their menstrual cycles.

115.   Defendant Bains knew that, if the jail policy were followed by detention officers, it was inevitable that Ms. Smith would continue to be allowed to possess mesh underwear.

116.   Despite two previous suicide attempts, Ms. Bains did nothing to ensure that each detention officer who worked in the unit knew that Ms. Smith was not permitted to possess mesh underwear.

117. Despite two previous suicide attempts, Ms. Bains did nothing to ensure that each detention officer who worked in the unit knew that Ms. Smith had previously attempted to use the mesh underwear to commit suicide.

118. The reason that Defendant Kelly provided mesh underwear to Ms. Smith was that no one informed her, through any channel, that Ms. Smith was not permitted to possess mesh underwear or that Ms. Smith had twice attempted to commit suicide using mesh underwear.

119. The reason that Defendant Keitt did not remove the mesh underwear from Ms. Smith's cell was that no one informed her, through any channel, that Ms. Smith was not permitted to possess mesh underwear or that Ms. Smith had twice attempted to commit suicide using mesh underwear.

120. Defendant Bains' deliberate indifference to the duty to issue a directive to detention officers prohibition them from supplying Ms. Smith with mesh underwear—knowing that it was the equivalent of giving a person on suicide watch a rope to hang themselves—made it inevitable that another deputy would give Ms. Smith the mesh underwear as a matter of routine practice. This indifference violated the Fourteenth Amendment of the United States Constitution.

<u>Count VII</u>

121.   This count is alleged against Defendant Wellpath, LLC, and its employees Tiarra Carter, Caryn Forbes, and Jeronia Bowden. This count incorporates the allegations set forth in ¶ 1–29.

122.   Wellpath, LLC is a private Delaware corporation that provides medical services to the Cobb County detention center pursuant to a contract with the Cobb County Sheriff's Office.

123.   Defendant Forbes was a licensed master social worker employed by Wellpath, LLC.

124.   Defendant Carter was a licensed master social worker employed by Wellpath, LLC.

125.   Defendant Bowden was a licensed master social worker employed by Wellpath, LLC.

126.   After Ms. Smith's May 13 suicide attempt, Defendants Carter, Forbes, and Bowden each visited Ms. Smith in the jail for the purposes of providing mental health treatment.

127.   On May 14, Ms. Smith told Defendant Forbes that the reason she attempted to kill herself was that her complaints about her medication had been ignored. Smith told Forbes that she was feeling hopeless and had started to work out a plan to kill herself again.

128.   On May 15, Ms. Smith told Defendant Bowden that it was very likely that she would attempt to commit suicide again. Smith told Bowden that she had suicidal ideations and remained suicidal.

129.   On May 16, Ms. Smith told Defendant Bowden that she had a plan and intent to commit suicide. Ms. Smith told Bowden that she planned to hang herself.

130.   On May 17, Ms. Smith spoke with Defendant Bowden and continued to endorse suicidal ideations and had a plan and intent to commit suicide.

131.   On May 18, a detention officer told Defendant Carter that Ms. Smith had stated that she planned to tell the mental health practitioners at the jail that she was no longer suicidal so that she could be removed from close observation and then, when moved to general population, commit suicide by hanging herself.

132.   On May 18, Ms. Smith attempted to follow through with the plan that the deputy had warned Defendant Carter about. Smith told Defendant Carter that she was no longer suicidal and wished to be returned to general population.

133.   Defendant Carter knew that Smith's claim that she was not suicidal was, in fact, a ruse to allow her to attempt to commit suicide.

134. The preceding information was documented in Ms. Smith's mental health treatment notes.

135. Defendants Bowden, Forbes, and Carter each reviewed each other's treatment notes and knew that Ms. Smith remained acutely suicidal each day following her May 13 suicide attempt.

136. Each time an inmate is placed under close observation, a copy of the form initiating close observation is kept in the inmate's housing unit to ensure that each deputy and mental health practitioner who interacts with that inmate is aware of any safety restrictions that have been enacted by either the deputies or mental health practitioners.

137. Defendant Forbes completed a new close observation form on April 14, 2022, which was kept in Ms. Smith's housing unit. Defendant Forbes and Defendant Padgett signed it.

138. The close observation form did not prohibit Ms. Smith from receiving mesh underwear, even though she attempted suicide twice using it.

139. The close observation form was the primary means by which the mental health staff could ensure communication with all staff assigned to Ms. Smith's housing unit.

140. Defendants Tiarra Carter, Caryn Forbes, and Jeronia Bowden each knew the following:

a. Ms. Smith's prior psychiatric medication had been abruptly discontinued by Wellpath.

b. Ms. Smith was routinely refusing the newly prescribed medication because it made her symptoms worse and brought on other negative side effects.

c. Ms. Smith attempted to commit suicide on April 11 and May 13 using underwear provided to her while under close observation.

d. Ms. Smith had not been seen by the jail's psychiatrist or advanced practice registered nurse since her April 11 suicide attempt.

e. Ms. Smith remained acutely suicidal following her April 11 and May 13 suicide attempts.

f. Ms. Smith remained on close observation in the jail, but her housing had not been elevated to constant watch.

g. No directive had been issued preventing Ms. Smith from receiving the mesh underwear Ms. Smith previously attempted to use to kill herself.

h. Each had the power to amend the close observation form to include the restriction on receiving mesh underwear.

141. Defendants Carter, Forbes, and Bowden's failure to ensure that Ms. Smith did not receive mesh underwear was negligent under Georgia law.

142.   Defendant Wellpath is liable for the actions of Defendants Carter, Forbes, and Bowden under the doctrines of respondeat superior and vicarious liability.

<u>Count VIII</u>

143.   This count is alleged against Defendant Wellpath, LLC, and its employees Tiarra Carter, Caryn Forbes, and Jeronia Bowden. This count incorporates the allegations set forth in ¶ 1–29.

144.   During the time period from May 14 to May 19, Ms. Smith remained under a form of suicide watch called "close observation."

145.   The most restrictive form of suicide watch available at the jail is called "constant watch."

146.   An inmate under constant watch is housed in a holding cell across from a staffed workstation in the infirmary where they can be continuously monitored by staff.

147.   Inmates placed on constant watch must remain on constant watch until cleared by an outside treating facility and returned to the jail.

148.   Any mental health practitioner, including Defendants Carter, Forbes, and Bowden could have elevated Ms. Smith's level of suicide watch to constant watch.

149. Defendants Carter, Forbes, and Bowden each failed to elevate Ms. Smith's level of suicide watch to constant watch despite knowing that Ms. Smith was acutely suicidal.

150. Defendants Carter, Forbes, and Bowden each knew that Ms. Smith had been refusing prescribed medication and had repeatedly complained about the negative effects of the prescribed medication.

151. Based on their reviews of Ms. Smith's treatment notes, Defendants Carter, Forbes, and Bowden each knew that Ms. Smith was not scheduled for a follow-up with the advanced practice registered nurse until June 27, 2022.

152. Defendants Carter, Forbes, and Bowden each failed to ensure that Ms. Smith was seen by the jail's doctor or advanced practice registered nurse following her May 13 suicide attempt, despite knowing that Ms. Smith remained suicidal and regularly refused her medications.

153. The failure to elevate Ms. Smith's level of suicide watch and ensure that Ms. Smith's care was elevated constitutes a gross deviation from the standard of care applicable to Defendants Carter, Forbes, and Bowden and was negligent under Georgia law.

154.   Defendant Wellpath is liable for the actions of Defendants Carter, Forbes, and Bowden under the doctrines of respondeat superior and vicarious liability under Georgia law.

Count IX

155.   This count is alleged against all Defendants. This count incorporates all preceding allegations.

156.   For all claims that arise under Georgia law, Plaintiffs seek attorneys' fees under O.C.G.A. § 13-6-11 on the basis of Defendants' bad faith.

Request for Relief

157.   Plaintiffs request:

a.   Hold a trial by jury on all issues so triable;

b.   Award general and special damages to Plaintiffs for the value of Ms. Smith's life in an amount to be determined by a jury;

c.   Award punitive damages against each Defendant sued in their individual capacity;

d.   Award reasonable attorney's fees under 42 U.S.C. § 1988 and O.C.G.A. § 13-6-11;

e.   Award such other further relied to which Plaintiffs are legally entitled, whether explicitly pleaded or not.

Submitted on May 14, 2024.

**G. Brian Spears**
G. Brian Spears
Georgia Bar No. 670112

**Jeff Filipovits**
Jeff Filipovits
Georgia Bar No. 825553

**Wingo F. Smith**
Wingo F. Smith
Georgia Bar No. 147896

**William Dixon James**
William Dixon James
Georgia Bar No. 003989

SPEARS & FILIPOVITS, LLC
315 W. Ponce de Leon Ave., Ste. 865
Decatur, Georgia 30030
404-905-2225
bspears@civil-rights.law
jeff@civil-rights.law
wingo@civil-rights.law

WM. DIXON JAMES, P.C.
One Decatur Town Center
150 East Ponce de Leon Avenue
Suite 260
Decatur, Georgia 30030
(404) 373-0072
DixonJames@DixonJamesLaw.com